1
2
3
4
5
6

IN THE UNITED STATES DISTRICT COURT

7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8
9
10

**United States District Court**
For the Northern District of California

REORGANIZED CALIFORNIA POWER
EXCHANGE CORPORATION,

No. C 15-01141 WHA
No. C 15-01149 WHA

Appellant,

Bk. No. 01-30923 DM

v.

PACIFIC GAS AND ELECTRIC CO.,

**ORDER AFFIRMING
BANKRUPTCY COURT
DECISION**

Appellee.

/

**INTRODUCTION**

In this bankruptcy appeal, the bankruptcy court granted the reorganized debtor's motion
to withdraw funds from an escrow account established to secure claims against it, over the
objection of a fiduciary for several claimants (itself, also a claimant). The bankruptcy court also
denied the fiduciary's request for an order requiring the reorganized debtor to replenish the
escrow account. The fiduciary seeks judicial review of both orders. For the reasons stated
below, the decision of the bankruptcy court is **AFFIRMED**.

**STATEMENT**

Appellee Pacific Gas and Electric Company was (and remains) a utility company, which
purchased electricity to serve its customers in California. In January 2001, due in part to
overcharges and manipulation by suppliers, which culminated in a state-wide energy crisis,
PG&E became unable to pay invoices for its electricity purchases. PG&E filed a Chapter 11

petition for bankruptcy in April 2001, and PG&E agreed to put a large sum in an escrow account as security for its debts, all as part of a plan of reorganization approved by the bankruptcy court.

This is an appeal from an order allowing PG&E to reduce the amount held in the escrow account. Here are the details.

**1.   THE CALIFORNIA ELECTRICITY MARKET.**

Appellant Reorganized California Power Exchange ("CalPX") is a non-profit public benefit corporation that is regulated by the Federal Energy Regulatory Commission.

Between 1998 and 2001, CalPX operated a wholesale electricity market. Suppliers sold electricity to CalPX, and buyers like PG&E purchased electricity from CalPX. CalPX did not make one-to-one matches between buyers and sellers. Instead, it "pooled" the supply and demand in the market, resulting in a single market price for all purchases and sales of electricity made in the CalPX market at a given time. CalPX invoiced buyers on a monthly basis and deposited payments into a clearinghouse account. CalPX paid suppliers from that clearinghouse account. Again, CalPX determined the prices in these transactions and delivered electricity and funds from "pools." The buyers and sellers never transacted directly.

PG&E purchased energy in the CalPX market. Due in part to overcharges and manipulation by suppliers in the market, PG&E became unable to pay its invoices to CalPX for October 2000 through January 2001, leading PG&E to file the instant Chapter 11 bankruptcy petition before Judge Dennis Montali in San Francisco. This left a deficit in CalPX's clearinghouse account. CalPX, in turn, became unable to pay suppliers, and it filed its own Chapter 11 bankruptcy petition, which proceeded before Judge Erithe A. Smith in the bankruptcy court in Los Angeles.

**2.   PG&E'S BANKRUPTCY.**

PG&E filed its petition for Chapter 11 bankruptcy in April 2011. In that proceeding, CalPX claimed PG&E owed approximately $1.78 billion in unpaid invoices for electricity. Electricity suppliers also filed individual claims against PG&E for the full sums they were owed from CalPX generally (that is, without regard to PG&E's share of the market).

**United States District Court**

For the Northern District of California

1    As stated, PG&E owed money to CalPX, which in turn owed money to the suppliers.

2    Again as stated, PG&E never directly transacted with the suppliers, so any individual suppliers'

3    claims against PG&E derived from CalPX's claim against it.  To avoid the problem that

4    individual suppliers' claims against PG&E might duplicate CalPX's claim against PG&E on

5    behalf of the pooled market, the bankruptcy court allowed an aggregate claim for CalPX and the

6    suppliers in the amount of approximately $1.78 billion, subject to further reconciliation of the

7    actual amounts owed in the markets.  The bankruptcy court declined to fix the dollar amount of

8    any individual supplier's claim or to determine which suppliers properly held claims at that time

9    (Bk. Dkt. No. 8371).  The aggregated set of CalPX's and individual suppliers' claims became

10   known as "Class 6" claims.  All of this became part of PG&E's plan of reorganization.

11   When PG&E proposed its reorganization plan in July 2003, CalPX, among other Class 6

12   claimants, objected to the plan.  PG&E entered into a negotiated stipulation with those claimants

13   and established an escrow account for the purpose of securing funds for the payment of Class 6

14   claims.  The negotiated stipulation included provisions governing withdrawals from that escrow

15   account.  PG&E deposited $1.6 billion into the Class 6 escrow account as security for the

16   aggregate of $1.78 billion in Class 6 claims, although the reorganization plan also required

17   PG&E to pay any Allowed Claims from its own pocket if the Class 6 escrow became depleted.

18   The provisions that governed the Class 6 escrow account serve critical roles in this appeal.

19   The pertinent part of Paragraph 1 of the stipulation provided (2 Appx., Exh. 6 at

20   345–46):[1]

21       Notwithstanding any language to the contrary in Section 5.4(g) of
         the PG&E plan, [PG&E] shall not seek to reduce the $1.6 billion
22       amount deposited into the Disputed Claims Escrow on account of
         the Class 6 Claims and shall not seek to estimate any or all of the
23       Class 6 Claims, unless and until there is a material change in
         circumstances resulting from one or more settlements or final
24       administrative or judicial (other than the Bankruptcy Court)
         determinations that would render the $1.6 billion reserve amount
25       unreasonably excessive.  Any such reduction in the amount
         deposited in the Disputed Claims Escrow pursuant to this
26       Stipulation shall be made only upon order of the Bankruptcy Court
         pursuant to a reasonably noticed motion.

27

28

---

[1]  Exhibits in the record are cited in the following format: [Volume] Appx., [Exhibit] at [Page].

United States District Court

For the Northern District of California

1   Paragraph 2 provided, in pertinent part (*id.* at 346):

2           If, after the Effective Date, [Class 6 Claims] become Allowed
            Claims, as provided in Section 5.4(g)(i) of the PG&E Plan, the
3           Allowed Class 6 Claims shall be paid in Cash in full and the
            Disputed Claims Escrow shall be reduced to reflect the difference
4           between the Allowed Amount of such claims and $1.6 billion.[2]

5           Ultimately, many individual suppliers resolved their Class 6 claims without receiving

6   payments directly from PG&E's Class 6 escrow account.  Instead, those suppliers negotiated

7   multilateral settlement agreements that resolved numerous claims arising out of the California

8   energy crisis including outstanding invoices for energy purchases owed by buyers (such as

9   PG&E) as well as refunds owed by the suppliers for overcharges.

10          PG&E sought to withdraw funds from the Class 6 escrow on account of credits it

11  received in two of these multilateral settlements — the first with TransAlta (U.S.), Inc., and

12  TransAlta Energy Marketing (California), Inc., the second with Avista Corporation.  The

13  bankruptcy court held that Paragraph 2, above, allowed the withdrawal.  CalPX argued that only

14  Paragraph 1 governed PG&E's withdrawal motions and that the bankruptcy court had to,

15  therefore, determine whether the amount in the Class 6 escrow account had become

16  "unreasonably excessive."  This same argument is the basis for the appeal by CalPX.

17          Before addressing this legal question, it is important to understand the administrative

18  proceedings relating to the overcharge-refunds and how they led to the credits that formed the

19  basis for reducing the escrow amount.

20          **3.      FEDERAL ENERGY REGULATORY COMMISSION
                       OVERCHARGE-REFUND PROCEEDINGS.**
21

22          The Federal Energy Regulatory Commission conducted an investigation into the prices in

23  the California energy markets and discovered that suppliers had been overcharging and

24  manipulating the market.  FERC instituted a series of administrative proceedings to determine

25  the amount, if any, that each of the suppliers had overcharged and requiring those suppliers to

26  _____

27          [2] Pursuant to Section 5.4(g)(i) of the PG&E reorganization plan, a Class 6 Claim "become[s] an
    Allowed Claim on the date designated by FERC when payments are to be made on account of [Class 6] Claims,
    pursuant to an unstayed order in the FERC Refund Proceedings . . ." (3 Appx., Exh. 8 at 738–39).  The term
28  "Allowed Amount" is not defined.  This order presumes that "Allowed Amount" means the cash value of an
    Allowed Claim.

4

1  pay refunds for those overcharges to the market.  Because CalPX never made one-to-one

2  matches between buyers and sellers, FERC could not determine which specific suppliers owed

3  refunds to which specific buyers or the proper amounts of those refunds.  Instead, at the time

4  FERC instituted the overcharge-refund proceedings, it envisioned issuing a final comprehensive

5  order that reflected every market participant's balance in the market including outstanding

6  invoices and overcharge-refunds.  FERC tasked CalPX with "re-running" its market operations

7  to determine the balances that would ultimately be reflected in its final order.  Once FERC

8  issued that final order, CalPX could settle all outstanding transactions at once through its

9  clearinghouse account.

10        Instead of waiting for FERC to issue its final order, however, some market participants

11 entered into complex multilateral settlement agreements.  This appeal concerns PG&E's role in

12 two such settlement agreements.

13        **4.    THE SETTLEMENT AGREEMENTS.**

14        PG&E and other buyers in the energy market have jointly entered into several dozen

15 settlement agreements, each with individual suppliers that settled the amount of the suppliers'

16 overcharge-refunds in the as yet unfinished FERC proceedings as well as any claims the

17 suppliers have against buyers, including Class 6 claims against PG&E.  As stated, the

18 transactions in the CalPX market never involved one-to-one matching of buyers and suppliers.

19 Nevertheless, these settlement agreements allocated the total overcharge-refunds among the

20 buyers based on some methodology that has not been explained in our record (which CalPX

21 describes as a "black box").  The settlements simplified cash flows by netting the amount owed

22 to the supplier for unpaid sales against the amount owed by the supplier for its overcharge-

23 refunds.  The agreements required FERC approval.

24        Although CalPX never joined in these settlement agreements as a party, the agreements

25 called for CalPX to facilitate the cash flows therein through its clearinghouse account.

26 Specifically, each settlement agreement called for CalPX to receive cash payments from certain

27 participants in those agreements and to distribute cash payments to others, both from its

28 clearinghouse account.  The agreements also called on CalPX to provide non-cash credits, called

**United States District Court**
For the Northern District of California

5

United States District Court
For the Northern District of California

1    "Deemed Distributions," to other participants, including PG&E, that still owed a balance to

2    CalPX based on outstanding invoices for energy purchases.

3           Because those agreements settled FERC overcharge-refund claims, they required FERC's

4    approval.  Prior to issuing an order approving each settlement agreement, FERC received

5    comments and objections from the parties to the overcharge-refund proceedings, including

6    CalPX.  Its orders approving settlements addressed each such comment and objection and

7    adopted protective measures in response to certain meritorious objections.  FERC's orders also

8    directed CalPX to implement each settlement agreement.

9           Each settlement agreement, including the two at issue here, included the following

10   provision (1 Appx., Exh. 2 at 94, Exh. 4 at 179):

11              FERC's approval of this Agreement in the FERC Settlement Order
                shall constitute approval of the treatment and allocation of Deemed
12              Distributions as provided herein, and constitutes FERC's
                determination that the escrow established by PG&E pursuant to its
13              Plan of Reorganization for payment of its outstanding debts to the
                [California Power Exchange] may be reduced in an amount equal
14              to its allocated share of [the Avista/TransAlta] Refunds.

15   Following each settlement agreement, PG&E filed a motion in the bankruptcy court seeking to

16   withdraw funds from the Class 6 escrow account.  Specifically, PG&E sought to withdraw the

17   principal amount of the Deemed Distribution it received in each agreement plus the interest that

18   accrued on that sum in the escrow account.  The bankruptcy court granted each of thirty-five

19   motions of this kind before the instant motions.

20          The first settlement agreement that employed the structure discussed above occurred in

21   2004 and involved The Williams Companies, Inc.  CalPX filed an objection the settlement in the

22   FERC proceeding, raising concerns about its role in funding the settlement from its

23   clearinghouse account.  Specifically, CalPX noted that because the settlement agreements

24   purported to match buyers and sellers using a "black box" methodology to which CalPX was not

25   privy CalPX had no way to assess the accuracy of the sums involved in the transaction.

26   Accordingly, CalPX sought to be held harmless for its conduct implementing the settlement

27   agreements.  FERC initially denied CalPX's request, but granted it on rehearing and

28   incorporated "hold harmless" protections for CalPX in the order approving the settlement

United States District Court

For the Northern District of California

1   agreement. *Compare* Order on Settlement Agreement, *San Diego Gas & Elec. Co., v. Sellers of*

2   *Energy and Ancillary Services*, 108 FERC ¶ 61,002 at P 47 (2004), *with* Order On Rehearing,

3   *San Diego Gas & Elec. Co., v. Sellers of Energy and Ancillary Services*, 111 FERC ¶ 61186 at P

4   19 (2005).  FERC has incorporated the language granting CalPX's request to be held harmless

5   from the Williams order on rehearing into each subsequent order approving a settlement

6   agreement.

7   Additionally, CalPX addressed the provision allowing PG&E to withdraw the amount of

8   its proceeds from the settlement in its comments on the Williams settlement agreement (which it

9   received as a Deemed Distribution) (Appellant's Request for Judicial Notice, Supp. Brief, Exh.

10  A at 14):

> As disclosed by the parties to the settlement agreement, PG&E could seek approval from the PG&E Bankruptcy Court to withdraw funds in an amount equal to PG&E's allocated portion of the Settlement Amount from the $1.6 billion escrow.  It is important to note that other parties may or may not object to any motion before the PG&E Bankruptcy Court to reduce the amount in the escrow and the PG&E Bankruptcy Court may or may not permit the withdrawal.  It is unclear what effect either an approval or denial of such an order by the PG&E Bankruptcy Court would have on the proposed settlement.

CalPX did not at that time, or at any time prior to the motions that led to this appeal, raise any

objections to PG&E's withdrawal or assert that the bankruptcy court could only approve such

motions if the amount in the Class 6 escrow had become "unreasonably excessive" as required

by Paragraph 1 of the stipulation governing the escrow account.  CalPX first raised that theory

with regards to the instant motions, after a long pattern and practice and course of dealing had

been established over the course of thirty-five previous withdrawal motions.

While PG&E's motions to withdraw funds following the TransAlta and Avista

settlements were pending at the bankruptcy court, PG&E and other buyers settled claims by and

against the California Department of Water Resources, State Water Project.  For the first time in

the FERC proceedings, CalPX objected to the inclusion of the provision (set forth above) that

stated that FERC's approval of the settlement constituted approval of the treatment of Deemed

Distributions and a determination that PG&E could reduce the amount in the Class 6 escrow

account.  FERC rejected CalPX's concerns:

7

**United States District Court**
For the Northern District of California

> Commission approval of the Settlement constitutes its
> determination that the escrow established in connection with the
> PG&E Bankruptcy Proceedings may be reduced by an amount
> equal to PG&E's share of the Settling Supplier Refunds.74 In our
> view, this does not constitute a determination that the Class 6
> Escrow funds must be released. In other words, the Commission's
> approval of the Settlement permits PG&E to then petition the
> Bankruptcy Court regarding such disbursement.

*San Diego Gas & Elec. Co., v. Sellers of Energy and Ancillary Services*, Order Approving

Contested Settlement, 149 FERC ¶ 61,115 at ¶ 31–33 (2014).

This appeal arises out of PG&E's motions in the bankruptcy court following the

TransAlta and Avista settlement agreements to withdraw the principal components of its

Deemed Distributions therein. The issue is which paragraph of the stipulation governing the

Class 6 escrow governs those motions. The bankruptcy court held (9 Appx., Exh. 34 at 2342):

> [Paragraph 2] specifically addresses PG&E's ability to deduct
> from the Class 6 Escrow the amounts paid to a Class 6 creditor
> whose claim has been finally allowed. Paragraph 1, in contrast,
> limits PG&E's ability to reduce the $1.6 billion escrow balance
> generally. The specific terms of Paragraph 2 of the Stipulation
> trump the general ones of Paragraph 1, given that PG&E is seeking
> the specific offset expressly permitted by Paragraph 2 and not the
> general relief described in Paragraph 1.

Accordingly, the bankruptcy court granted PG&E's withdrawal motions pursuant to Paragraph 2,

without determining whether the amount in the escrow had become "unreasonably excessive"

under Paragraph 1. Before addressing the legal conclusion, however, this order sets forth the

economic substance of the agreements that gave rise to the dispute on appeal.

**5.     THE ECONOMIC SUBSTANCE OF TRANSALTA AND AVISTA AGREEMENTS.**

On October 28, this Court held a hearing in an effort to understand the economic

substance of the complex settlement agreements that gave rise to the issues herein. At the

hearing, counsel for PG&E walked us through the relevant substance of one of the two

settlement agreements at issue herein — that with Avista — and explained the flow of cash

among Avista, PG&E, CalPX, and other entities involved in the agreement. At the hearing, the

Court asked the parties to submit supplemental briefs explaining the cash flows and economic

substance for both settlement agreements in further detail and to respond to each others'

supplemental briefs. The Court asked the parties to submit a second round of supplemental

United States District Court

For the Northern District of California

1  briefs, explaining the transactions in further detail and explaining CalPX's role and position

2  regarding the mechanism of so-called "Deemed Distributions."

3       This order now sets forth the relevant details of the settlement agreements at issue herein,

4  as understood from a review of the settlement agreements themselves and the supplemental

5  briefs of the parties.

6                    **A.      TransAlta Agreement.**

7       The parties to the TransAlta agreement determined that TransAlta owed (to all victims) a

8  gross amount of $149,000,000 based on its overcharges.  The parties specifically determined that

9  PG&E's share of TransAlta's overcharges was $58,240,220, with the balance ($88,959,780)

10  owed to other buyers, which allocation the parties determined according to a "black box"

11  methodology not reflected in our record.  PG&E's share of the overcharge-refunds ($58,240,220)

12  comprised $30,806,344 in principal and $27,433,876 in interest.

13       Turning to the other side of the ledger, TransAlta filed a proof of claim against PG&E for

14  $52,452,003 (its Class 6 claim).  That sum reflected the TransAlta's entire outstanding balance

15  in the pooled CalPX market (and another market run by the California Independent Systems

16  Operator) without accounting for any overcharge-refunds — not just sales attributable to PG&E.

17  The parties determined that TransAlta had not been paid for sales in the CalPX and CAISO

18  markets amounting to $97 million, comprising $51,582,950 in principal and $45,417,050 in

19  interest.

20       There is no information in the record regarding PG&E's share of the $97 million owed to

21  TransAlta, since CalPX did not match buyers and sellers.  That sum reflected the amount owed

22  to TransAlta from the entire pooled market.  Neither PG&E nor any other settling buyers made a

23  cash payment as part of the TransAlta agreement, nor did it withdraw funds from the Class 6

24  escrow.  TransAlta withdrew its Class 6 claim against PG&E with prejudice.

25       The full $149 million (owed by TransAlta) was netted against the $97 million (owed to

26  TransAlta).  So, TransAlta made a cash payment of $52 million, which it transferred to an

27  escrow account jointly established by the settling buyers set to receive cash disbursements (*i.e.*,

28

United States District Court
For the Northern District of California

1  not PG&E or other Deemed Distribution recipients) for the purpose of effecting such

2  disbursement.

3       Nevertheless, the settlement agreement still called for the distribution of $149 million to

4  buyers (including PG&E).  That distribution came from numerous sources in addition to the $52

5  million from TransAlta.  *First*, CalPX transferred cash to the TransAlta overcharge-refund

6  escrow.  *Second*, and most critically for our case, in lieu of cash distributions, the settlement

7  agreement instructed CalPX to give credits, called "Deemed Distributions" to three electricity

8  buyers that still had balances with CalPX in the amount of their respective shares of TransAlta's

9  overcharge-refund.  PG&E received such a Deemed Distribution because it still owed money to

10  CalPX based on its unpaid invoices (which CalPX, in turn, owed to suppliers that had not yet

11  settled their claims).  Thus, CalPX did not distribute cash to PG&E on account of its share of the

12  settlement proceeds but instead counted PG&E's share ($58,240,220) as a credit against its

13  overall balance with CalPX — a "Deemed Distribution."

14       PG&E now seeks to withdraw $35,050,199 from the Class 6 escrow account.  That

15  comprises the principal component of its Deemed Distribution under the TransAlta agreement

16  ($30,514,393) and the interest earned on that sum in the Class 6 escrow account ($5,535,805).[3]

17       Below is a chart reflecting the key figures discussed above:

| | | |
|---|---|---|
| TransAlta's Claim Filed in PG&E's Bankruptcy | $52,452,003 | |
| TransAlta's Overcharge-Refund Liability (all buyers, not just PG&E) | $149,000,000 | |
| Amount Owed to TransAlta for Unpaid Sales | Total: Principal: Interest: | $97,000,000 $51,582,950 $45,417,050 |
| TransAlta's Net Payment | $52,000,000 | |
| PG&E's Deemed Distribution/Share of Overcharge-Refunds (Settlement Agreement) | Total: Principal: Interest: | $58,240,220 $30,806,344 $27,433,876 |

[3] By the time CalPX received instructions to account for PG&E's deemed distribution under the TransAlta agreement, the numbers had shifted: a post-settlement payment reduced PG&E's principal to $30,514,393, and further interest accrued resulting in an interest component of $28,526,930, totaling $59,041,323.

10

| | | |
|---|---|---|
| PG&E's Deemed Distribution (CalPX's Books) | Total: | $59,041,323 |
| | Principal: | $30,514,393 |
| | Interest: | $28,526,930 |
| PG&E's Withdrawal Request | Total: | $36,050,199 |
| | Principal: | $30,514,393 |
| | Interest: | $5,535,805 |

### B.      Avista Agreement.

The relevant components of the Avista transaction largely paralleled the TransAlta transaction.  The main distinction is that Avista received a net distribution from the settlement, unlike TransAlta, which paid money as a result of the settlement.

The parties to the Avista transaction determined that Avista owed (to all victims) a gross amount of $58,136,635 based on its overcharges.  They specifically determined that PG&E's share of Avista's overcharges was $26,969,818, with the balance ($26,966,817) owed to other buyers, which allocation the parties determined according to a "black box" methodology not reflected in our record.  PG&E's share of Avista's overcharge-refunds comprised $14,016,012 in principal and $12,953,806 in interest.

Turning to the other side of the ledger, Avista filed a proof of claim against PG&E for $43,960,105 (its Class 6 claim).  That sum reflected Avista's entire outstanding balance in the pooled CalPX market and (and the other market run by CAISO) without accounting for overcharge-refunds — not just sales attributable to PG&E.  The parties determined that Avista had not been paid for sales in the CalPX and CAISO markets amounting to $73,136,635, comprising $37,518,931 in principal and $35,617,704 in interest.

As with the TransAlta agreement, there is no information in the record regarding PG&E's share of the $73,136,635 owed to Avista.  Neither PG&E nor any other settling buyer made a cash payment as part of the Avista agreement, nor did PG&E withdraw funds from the Class 6 escrow.  Avista withdrew its Class 6 claim against PG&E with prejudice.

The full $58,136,635 (owed by Avista) was netted against the $73,136,635 (owed to Avista).  So, Avista received a cash net distribution of $15 million as a result of the settlement, paid by CalPX from its clearinghouse account.  That cash came from CalPX's reserves without affecting PG&E's or any other buyers' balances.  The settlement agreement also called for the

11

United States District Court

For the Northern District of California

1  distribution of $58,136,635 in overcharge-refunds on account of Avista's transactions in the

2  market.  As with TransAlta, that distribution came from numerous sources, including both cash-

3  payments and Deemed Distributions in the amount of certain buyers' shares of the overcharge-

4  refund.  PG&E received such a Deemed Distribution because it still owed money to CalPX based

5  on its unpaid invoices (which CalPX, in turn, owed to suppliers that had not yet settled their

6  claims).  Thus, CalPX did not distribute cash to PG&E on account of its share of the settlement

7  proceeds but instead counted PG&E's share ($26,969,818) against its overall balance with

8  CalPX — another "Deemed Distribution."

9       PG&E now seeks to withdraw $16,466,914 from the Class 6 escrow account.  That

10  comprises the principal amount of its Deemed Distribution under the Avista agreement

11  ($14,016,012) and the interest earned on that sum in the Class 6 escrow account ($2,450,902).

12       Below is a chart reflecting the key figures discussed above:

| | | |
|---|---|---|
| Avista's Claim Filed in PG&E's Bankruptcy | $43,960,105 | |
| Avista's Overcharge-Refund Liability (all buyers, not just PG&E) | $58,136,635 | |
| Amount Owed to Avista for Unpaid Sales | Total: | $73,136,635 |
| | Principal: | $37,518,931 |
| | Interest: | $35,617,704 |
| Avista's Net Distribution | $15,000,000 | |
| PG&E's Deemed Distribution/Share of Overcharge-Refunds (per Settlement Agreement) | Total: | $26,969,818 |
| | Principal: | $14,016,012 |
| | Interest: | $12,953,806 |
| PG&E's Deemed Distribution (on CalPX's Books) | Total: | $26,969,818 |
| | Principal: | $14,016,012 |
| | Interest: | $12,953,806 |
| PG&E's Withdrawal Request | Total: | $16,466,914 |
| | Principal: | $14,016,012 |
| | Interest: | $2,450,902 |

                    *              *                 *

26       PG&E filed two motions at the bankruptcy court.  The first sought to withdraw

27  $36,050,199 from the Class 6 escrow, which reflected the principal component of its Deemed

28  Distribution under the TransAlta agreement, plus the interest that had accrued on that sum in the

United States District Court

For the Northern District of California

1   Class 6 escrow account.  The second motion sought to withdraw $16,466,914 from the Class 6

2   escrow account, which reflected the principal component of PG&E's Deemed Distribution under

3   the Avista agreement, plus the interest that had accrued on that sum in the Class 6 escrow

4   account.  CalPX objected to both motions.  CalPX also moved for an order requiring PG&E to

5   replenish the Class 6 escrow account.

6          After full briefing and two hearings (the latter following supplemental briefing), the

7   bankruptcy court granted PG&E's motions over CalPX's objections and denied CalPX's motion

8   to require PG&E to replenish the Class 6 escrow account.  CalPX appeals each of the bankruptcy

9   court's decisions.  This order follows full briefing, oral argument, and two rounds of

10  supplemental briefing.

11                                         **ANALYSIS**

12         The parties agree that the bankruptcy court's interpretations of the documents governing

13  the Class 6 escrow account addressed questions of law and as such, are reviewed *de novo*.  *In re*

14  *Hamada*, 291 F.3d 645, 659 (9th Cir. 2002).  The bankruptcy court's decisions regarding

15  PG&E's withdrawal motions and CalPX's replenishment motion are addressed in turn.

16         **1.      PG&E'S WITHDRAWAL MOTIONS.**

17         CalPX contends that Paragraph 1 of the stipulation governs PG&E's motions to withdraw

18  funds from the Class 6 escrow because, it argues, Paragraph 1 generally prohibits PG&E from

19  seeking to reduce the amount in the escrow ("[PG&E] *shall not* seek to reduce the $1.6 billion

20  amount deposited into the Disputed Claims Escrow") and provides a sole exception to that

21  prohibition ("*unless and until* there is a material change in circumstances . . . that would render

22  the $1.6 billion reserve amount unreasonably excessive.").

23         PG&E responds, as the bankruptcy court held, that Paragraph 2 governs its withdrawal

24  motions because Paragraph 2 requires a reduction in the Class 6 escrow upon the allowance of

25  any Class 6 claim without identifying the proponent of the reduction or the recipient of the funds

26  ("the Allowed Class 6 Claims shall be paid in Cash in full and the Disputed Claims Escrow *shall*

27  be reduced to reflect the difference between the Allowed Amount of such claims and $1.6

28  billion.").

United States District Court

For the Northern District of California

1    PG&E's Deemed Distributions under the TransAlta and Avista settlements were credits

2    for money owed *to* PG&E by the respective suppliers on account of the suppliers' overcharges in

3    the energy market.  The Deemed Distributions did not reflect TransAlta's or Avista's respective

4    Class 6 claims *against* PG&E.  In fact, TransAlta and Avista withdrew their Class 6 claims with

5    prejudice as part of their respective settlements.  Thus, PG&E's request to withdraw the principal

6    components of its Deemed Distributions under the TransAlta and Avista agreements is not a

7    request to reduce the amount of their Allowed Class 6 claims — their Class 6 claims never

8    became "allowed."

9    Thus, if we were writing on a clean slate as of the time of the first such settlement in

10   2004, it is likely that the Court would hold that Paragraph 2 does not authorize PG&E to

11   withdraw the principal component of its Deemed Distributions and would therefore reverse.

12   But we are *not* writing on a clean slate.  A long course of conduct and construction of the

13   plan cannot be ignored.  The resolution of the Class 6 claims has evolved in a different manner

14   than that originally contemplated.  Instead of direct payments of Class 6 claims, they have been

15   settled as part of FERC proceedings in which the Class 6 claims have been set off, more or less,

16   against the overcharge-refunds, resulting in "Deemed Distributions" on the books of CalPX and

17   further resulting in reductions of the escrow in question in numerous transactions.  Until now,

18   CalPX has not once objected to this procedure.  (Its objections to previous settlement agreements

19   addressed FERC's "hold harmless" treatment.)  Although PG&E's Deemed Distributions do not

20   reflect a payment on account of *suppliers'* Class 6 claims, they reflect a transfer of value on the

21   books of CalPX for the benefit of PG&E.  FERC's orders approving the TransAlta and Avista

22   settlements and directing CalPX to implement those agreements result in a partial payment

23   (albeit with credit, not with cash) of CalPX's own derivative Class 6 claim against PG&E.

24   It is a "cardinal rule of construction that when a contract is ambiguous or uncertain the

25   practical construction placed upon it by the parties before any controversy arises as to its

26   meaning affords one of the most reliable means of determining the intent of the parties."

27   *Sterling v. Taylor*, 40 Cal. 4th 757, 772–73 (2007).  Over the past decade and with regard to

28   thirty-five similar motions it has been the practice of the parties, CalPX included, to allow

1   PG&E to withdraw the principal component of its Deemed Distributions without showing that

2   the "unreasonably excessive" standard had been met.  CalPX had numerous occasions to object

3   to this construction.  It is now too late for CalPX to contend this practical construction is

4   improper.

5            This result in no way defeats the purpose of the Class 6 escrow, namely, to secure the

6   claims of the individual suppliers.  *First*, the individual claims by TransAlta and Avista are gone.

7   *Second*, the CalPX credit in favor of PG&E is effectively CalPX's own further fund for the

8   benefit of suppliers who have not yet settled.  Although PG&E's balance with CalPX remains

9   negative at the moment, PG&E's Deemed Distributions may ultimately result in a positive

10  balance with CalPX, and CalPX may, in turn, pay off its balance by satisfying individual

11  suppliers' claims.  (As discussed above, individual suppliers' Class 6 claims against PG&E

12  derived from CalPX's claims.)  Moreover, PG&E would still be required to meet the

13  "unreasonably excessive" standard to make a *general* withdrawal from the Class 6 escrow, such

14  as one with no nexus to the resolution of Class 6 claims whatsoever.

15           Thus, the bankruptcy court properly determined that Paragraph 2 of the stipulation

16  governing the Class 6 escrow applied to PG&E's motions to withdraw funds, so the

17  "unreasonably excessive" standard did not apply.  The order granting PG&E's withdrawal

18  motions is hereby **AFFIRMED**.

19           **2.      CALPX'S REPLENISHMENT MOTION.**

20           In response to PG&E's motions to withdraw funds, CalPX also filed a motion to require

21  PG&E to replenish the Class 6 escrow account in light of fears that the balance on the account

22  inadequately secured the outstanding Class 6 claims in light of the alleged shortfall and PG&'s

23  financial outlook.  The bankruptcy court denied CalPX's motion because "[t]he relevant

24  governing documents do not provide for a general increase in the Class 6 Escrow amount to

25  accommodate fears regarding PG&E's financial future" (9 Appx., Exh. 34 at 2341).  For the

26  reasons stated below, that aspect of the bankruptcy court's order is **AFFIRMED**.

27           **A.      Appellate Jurisdiction.**

28

United States District Court

For the Northern District of California

15

**United States District Court**
For the Northern District of California

1    PG&E argues that the bankruptcy court's denial of CalPX's motion for replenishment is

2    not ripe for appeal and must be dismissed.  A district court's appellate jurisdiction over a

3    bankruptcy proceeding is set forth in Section 158(a) of Title 28 of the United States Code, which

4    provides, in pertinent part:

5            The district courts of the United States shall have jurisdiction to
             hear appeals:

6
             (1) from final judgments, orders, and decrees
7
             * * *
8
             and (3) with leave of court, from other interlocutory orders and
9            decrees.

10    It is undisputed that CalPX did not seek leave to file this appeal.  Accordingly, appellate

11    jurisdiction is only proper to the extent the bankruptcy court's order was a final judgment, order,

12    or decree.  PG&E argues that it was not.

13    A final order in a bankruptcy proceeding is one that "finally determines the discrete

14    matter to which it was addressed, determines and seriously affects substantial rights and can

15    cause irreparable harm if the losing party must wait until bankruptcy proceedings terminate

16    before appealing."  *Preblich v. Battley*, 181 F.3d 1048, 1056 (9th Cir. 1999).  CalPX's motion is

17    premised on the concern that the amount in the escrow account could be depleted before all

18    Class 6 claims are paid, and given PG&E's financial outlook, it may be unable to make up for

19    that shortfall.  CalPX has no remedy, apart from this appeal, to prevent that possibility.  This

20    order finds CalPX's appeal of the order of the bankruptcy court was final for the purposes of this

21    Court's jurisdiction.

22            **B.    The Bankruptcy Court Lacked Authority to Order Replenishment.**

23    The bankruptcy court determined, "[t]he relevant governing documents do not provide

24    for a general increase in the Class 6 Escrow amount to accommodate fears regarding PG&E's

25    financial future" (9 Appx., Exh. 34 at 2341).  CalPX argues that the bankruptcy court erred by

26    denying its motion to compel PG&E to replenish the Class 6 escrow account.  Neither the PG&E

27    reorganization plan nor the stipulation expressly provides for such replenishment.  The PG&E

28    reorganization plan does provide other protections for the Class 6 claimants in the event the

United States District Court

For the Northern District of California

1 balance in the escrow fund proves insufficient to pay outstanding Class 6 claims.  Section

2 5.4(g)(iii) of the PG&E reorganization plan provided (3 Appx., Exh. 8 at 839):

3 > In the event that the amount of Cash deposited into the escrows is
> insufficient to make the required payment upon a Disputed Claim
4 > becoming an Allowed Claim, [PG&E] will pay the holder of such
> Allowed Claim the Cash necessary to satisfy the shortfall.

5 Similarly, Section 4(b) of the escrow agreement provided (2 Appx., Exh. 6 at 367):

6

7 > In the event that the funds remaining in the Escrow Fund are not
> sufficient to make a timely payment required under Paragraph 4(a)
> above, PG&E shall make a deposit to the Escrow Fund in an
8 > amount equal to any shortfall in immediately available funds. . . .

9 Thus, the governing documents required PG&E to make up for any shortfall in the amount

10 available to pay specific Allowed Claims directly.  Nothing in those documents provided for

11 replenishment of the escrow account due to general concerns about PG&E's financial outlook.

12       Nevertheless, CalPX argues those provisions did not foreclose the possibility of a

13 bankruptcy court ordering replenishment and that Section 5.4(g)(i) of the PG&E reorganization

14 plan contemplated such replenishment.  That section provided (3 Appx., Exh. 8 at 738)

15 (emphasis added):

16 > [PG&E] shall establish one or more separate escrows, each of
> which shall be administered in a accordance with the terms hereof
17 > and pursuant to the direction of the Bankruptcy Court, and shall
> deposit or segregate into such escrow account(s) sufficient Cash to
18 > make distributions in respect of Disputed Claim . . . .  The amount
> to be deposited into such escrow by [PG&E] shall be determined
19 > by the Bankruptcy Court pursuant to a reasonably noticed motion;
> provided however, that the escrowed amount for Class 6 Claims
20 > shall be at least $1.6 billion *absent further order of the Bankruptcy
> Court.*

21

22 CalPX argues that this provision granted the bankruptcy court authority to order PG&E to

augment the amount in the escrow account at any time at his discretion.
23

24       Section 5.4(g)(i) contemplated the initial deposit into the Class 6 escrow, which could be

modified by an order from the bankruptcy court as the other aspects of PG&E's reorganization
25

26 fell into place.  It did not provide for continued maintenance of that sum by the bankruptcy court.

PG&E is already required to pay any specific Allowed Claims from its own pocket if the Class 6
27

28 escrow funds are insufficient, and that is the exclusive remedy for any shortfall.  The drafters of

the PG&E reorganization plan and the escrow agreement plainly knew how to account for the

17

1    risk of shortfall, and their failure to include a provision to account for speculative risk due to

2    PG&E's financial outlook is telling.  Thus, in the absence of a finding that PG&E wrongfully

3    withdrew funds from the escrow, this order affirms the determination of the bankruptcy court

4    that it lacked authority to order PG&E to augment the amount in the Class 6 escrow account.

5            As this order finds the bankruptcy court correctly determined that it lacked authority to

6    order PG&E to replenish the escrow account, CalPX's argument that an evidentiary hearing was

7    necessary to resolve that motion is moot.

8                                              **CONCLUSION**

9            For the reasons stated above, the bankruptcy court's order granting Pacific Gas &

10   Electric Co.'s motions to withdraw $36,050,199 and $16,466,914 on account of the TransAlta

11   and Avista settlements respectively is **AFFIRMED**.  The order denying Reorganized California

12   Power Exchange's motion to compel Pacific Gas & Electric Co. to replenish the escrow account

13   is also **AFFIRMED**.

14           The parties have requested judicial notice of certain documents relating to Pacific Gas &

15   Electric Co.'s financial outlook and filings both in the bankruptcy court and in the FERC

16   proceedings.  To the extent not referred to above, those documents were not necessary to decide

17   this order and the parties' requests for judicial notice are **DENIED AS MOOT**.

18

19           **IT IS SO ORDERED.**

20

21   Dated:   December 14, 2015.

22                                                        WILLIAM ALSUP
                                                         UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28

United States District Court
For the Northern District of California

18